## MORTON SALT CO. v. FEDERAL TRADE COMMISSION.

### No. 8703.

Circuit Court of Appeals, Seventh Circuit.

May 27, 1947.

Rehearing Denied Sept. 4, 1947.

MINTON, Circuit Judge, dissenting.

L. M. McBride and Edward H. Baker, Jr., both of Chicago, Ill., for petitioner.

W. T. Kelley, Gen. Counsel, Walter B. Wooden, Associate Gen. Counsel, and Donovan Divet, Sp. Atty. Federal Trade Commission, all of Washington, D. C., for respondent.

Before SPARKS and MINTON, Circuit Judges, and BRIGGLE, District Judge.

BRIGGLE, District Judge.

The petitioner seeks to set aside a modified order of the respondent Commission to cease and desist from discriminating in the price of its salt products of like grade and quality as among wholesale or retail dealers when the differences in price are not justified in " * * * differences in the cost of manufacture, sale, or delivery resulting from differing methods or quantities in which such products are sold or delivered (a) by selling such products to some wholesalers thereof at prices different from the prices charged other wholesalers who in fact compete in the sale and distribution of such products; provided, however, that this shall not prevent price differences of less than five cents per case which do not tend to lessen, injure, or destroy competition among such wholesalers; (b) by selling such products to some retailers thereof at prices different from the prices charged other retailers who in fact compete in the sale and distribution of such products; provided, however, that this shall not prevent price differences of less than five cents per case which do not tend to lessen, injure, or destroy competition among such retailers; (c) by selling such products to any retailer at prices lower than prices charged wholesalers whose customers compete with such retailer. For the purposes of comparison, the term "price" as used in this order takes into account discounts, rebates, allowances, and other terms and conditions of sale."

The order complained of issued in a proceeding initiated by the respondent Commission in which it charged petitioner with discriminating in price between different purchasers of its product through quantity discounts in effect since June 19, 1936, in violation of Section 2(a) of the Clayton Anti-Trust Act, as amended by the Act, commonly referred to as the Robinson-Patman Price Discrimination Act, Act of June 19, 1936, U.S.C.A. Title 15, Sec. 13. The respondent Commission has filed a cross-petition praying affirmance and enforcement of its modified order.

The complaint issued on September 18, 1940. After extensive hearings the original findings and order issued on July 28, 1944. In October of that year a petition for review was filed in this Court and in February of 1945, pursuant to stipulation, it was ordered that the cause be remanded to the Federal Trade Commission for modification of findings of fact and of the cease and desist order. The modified order now before the Court issued by the respondent Commission on April 14, 1945.

Petitioner is an Illinois corporation producing, manufacturing and selling salt in interstate commerce in all parts of the United States to wholesalers, retailers and consumers, and is one of the largest producers and distributors of this product in the country. Table salt is the only product involved in this proceeding. Table salts produced and distributed by petitioner are variously known as Morton's free running, plain and iodized, Morton's Blue Label, Morton's Blue Package, and Morton's round can. Blue Label or Blue Package salt is packed and sold 24 packages to the carton or case, and this variety appears to also be identified as round can, iodized, etc. This grade or variety will be referred to as Blue Label.

In selling Blue Label salt petitioner allows three separate discounts, all based on purchases of very large quantities. A fourth discount applies to other varieties of table salt. These price differentials and the basis thereof are substantially, as follows:

(1) Blue Label salt sells for $1.50 per case when purchased in carload lots and at $1.60 when purchased in less than carload lots. The 10 cent differential approximates the extra cost of handling a less than carload shipment moving from a warehouse or

other car destination point to some outside point, entailing a double handling. In such cases the freight would be paid by petitioner and the amount thereof might exceed or be less than the 10 cent differential.

(2) A rebate of 10 cents from the $1.50 a case price applicable to carload shipments is also granted to customers purchasing 5,000 or more cases in any consecutive 12 month period.

(3) In lieu of the 10 cent rebate to purchasers of 5,000 or more cases of this salt, a rebate of 15 cents a case from the $1.50 price is allowed to purchasers of 50,000 or more cases during any consecutive 12 month period.

(4) To purchasers of $50,000 or more of table salt other than the Blue Package variety, in any 12 consecutive month period, there is granted a one unit (about 5%) discount. Although this discount is not allowed on the Blue Package purchases, these purchases are included in the computation of total purchases of a customer which determine whether or not that customer has qualified as a $50,000 discount buyer. In computing the $50,000 bracket, f.o.b. plant prices are used for all items except the Blue Package, regardless of other discounts, and the delivered price of the Blue Package is used regardless of other discounts.

The 10 cent per case, 15 cent per case and $50,000 discounts are based upon quantity sales but are not related by evidence in the record to any specified economies resulting to petitioner from cumulative purchases of the size covered by these respective discounts. In this respect these discounts differ from the carload discount of 10 cents a case.

The carload discount (No. 1) has been in effect since the organization of the Morton Salt Company in 1922. The 5,000 case (No. 2) and 50,000 case (No. 3) discounts were introduced by the Company in 1927 or 1928 and have not since then been changed. The $50,000 discount (No. 4) was started in 1933 or 1934 and since then has been unchanged.

In addition to these standard regular quantity discounts, it appears from the record that petitioner in a few instances has made special allowances or discounts of a

competitive nature applicable to particular customers and limited areas. The findings and order of the Commission are in part predicated upon the so-called competitive adjustments and same should be distinguished from the general price discounts above described and the findings in respect thereto. The findings and order of the Commission in respect to the general price discounts raises the basic questions now in controversy. We will hereinafter refer to these discounts as "quantity" discounts.

The quantity discounts applicable to the table salt sales of petitioner are open and available on equal terms to all customers, and it is not contended that any of said discounts or the price system which embraces them all was formulated to give any particular customer or customers or a selected class of customers a cost advantage over others who qualify therefor by quantity purchases. It is not claimed that there has been anything secret, local, special or personal about any such quantity discount as offered by petitioner to any of its customers. Each quantity discount and the quantity discount system of petitioner were and are national in scope, published, known and equally available to all. At all times pertinent to the present controversy these quantity discounts conformed with trade practices generally in the distribution and sale of staple merchandise by other producers and manufacturers of such merchandise. If the quantity price system of petitioner is inherently discriminatory, within the meaning of this Act, as contended by the respondent Commission, then such discrimination is inherent in, and inseparable from the quantity discount price structures of many other commodities similarly manufactured, sold and distributed. This conclusion is implicit in the findings, as based upon the evidence, and in the order of the Commission, and gives a scope to the determination of the instant question beyond its immediate effect upon the business practices of petitioner.

Section 2(a) of the Clayton Act, as amended, omitting all proviso clauses, is, as follows: "It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different

954

purchasers of commodities *of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such* commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, *or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.*"

The italicized language was inserted in the original section by the 1936 amendment, Robinson-Patman Act.

The original proviso to Section 2(a), insofar as pertinent, read "Provided, that nothing herein contained shall prevent discrimination in price between purchasers of commodities on account of differences in the grade, quality, or quantity of the commodities sold, or that makes only due allowances for difference in the cost of selling or transportation. * * *"

The 1936 amendment changed this language to read "Provided, that nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered: Provided, however, That the Federal Trade Commission may, after due investigation and hearing to all interested parties, fix and establish quantity limits, and revise the same as it finds necessary, as to particular commodities or classes of commodities, where it finds that available purchasers in greater quantities are so few as to render differentials on account thereof unjustly discriminatory or promotive of monopoly in any line of commerce; and the foregoing shall then not be construed to permit differentials based on differences in quantities greater than those so fixed and established."

In view of the questions raised, Section 2(b) of the Act, contained in the 1936 amendment, is also pertinent, and is, as follows: "Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: Provided, however, That nothing (herein contained) * * * shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitior, or the services or facilities furnished by a competitor." U.S. C.A. Title 15, Sec. 13.

The original section did not apply to quantity discounts. Under the amended section a quantity discount based upon an actual difference in the cost of manufacture, sale or delivery resulting from the different method or quantity in which petitioner sells its table salt is not in violation of the section because of the express language of the first proviso to the amended section.

The basic, prime questions in dispute are whether said quantity discounts of petitioner are discriminatory as a matter of law, and do they inherently have the probable effect upon competition condemned by the Act. There arise several supplementary and perhaps controlling questions upon that phase of the case which relates to general quantity discounts. . There are also presented similar questions in respect to the alleged competitive price adjustments, and whether the order in its scope and sweeping generality exceeds the jurisdiction of the Commission.

We take the view that discrimination within the meaning of the Act is not synonymous with harmless differentiation. One discriminates whenever he marks a difference, in the general sense, and a difference is marked by drawing any distinction. However, discrimination in respect to regulation of commerce is not harmless differentiation. It is the act of unfairly, in-

juriously and prejudicially distinguishing between persons or objects, where economically speaking a sound and fair distinction does not exist. It occurs as a matter of law only when Section 2(a) of the Clayton Act, as amended, is in fact violated.

■ A distinction in price based upon the quantity sold and conforming with reasonable, customary and accepted economic differences does not inherently import an adverse effect upon competition, or the likelihood thereof, condemned by said Act. This Court recently took this view upon the somewhat similar price differentials based on type of containers and quantities sold in the case of Corn Products Refining Co. v. Federal Trade Commission, 7 Cir., 144 F.2d 211, 215, wherein we said:

"Under Section 2(a) it is unlawful to discriminate in price between different purchasers where the effect 'may be' substantially to lessen competition or to injure, destroy or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination. It is the congressional intent to halt in its incipiency any possible injury to the public before it may have actually weakened the fabric of fair competition.

\* \* \* \* \* \*

"Petitioners shipped its products to its customers in carload lots, tank truck loads, returnable steel drums, barrels, half barrels, 10-gallon kegs and 5-gallon kegs. An established differential in prices existed, dependent upon the size of the containers, the additional price per 100 weight over tank car prices being as follows: when shipped in tank trucks of the customer, 2 cents; when delivered by petitioners' equipment, 10 cents; when shipped in returnable steel drums, when there is no return freight paid, 13 cents; when the return freight on the empty drum is between 50 cents and 75 cents per hundred, 18 cents; when it is between 76 cents and 90 cents per hundred, 23 cents; when it is between 91 cents and $1, 28 cents; when the return freight on the empty drum is more than $1 per hundred 33 cents; 5-gallon kegs $1.08; 10-gallon kegs 98 cents; half barrels 56 cents; barrels 33 cents. This is the only evidence submitted upon this issue and upon it the

Commission found petitioners guilty of unlawful discrimination.

"The evidence is merely that the smaller the container the greater proportionately the cost. There is nothing to show that this resulted in any discrimination among competing purchasers other than to create such differences as normally arise in buying in smaller quantities or in larger quantities. We think the facts furnish no basis whatever for any sound inference of violation of the law in this respect."

In the somewhat similar case of Lipson v. Socony Vacuum Corporation, 1 Cir., 87 F.2d 265, 269, it was asserted that a certain contract was in violation of Section 3 of the Clayton Act, 15 U.S.C.A. § 14. The Court said: "It is obvious from his declarations that the defendants' policy does not affect the amount of sales by the plaintiff of the defendants' products, but only his profits, since the inference is clear that he has supplied all demands of his customers for 'Socony' gasoline, though at a less profit than if he could buy on the tank car market. He does not allege, however, in his amended declaration, that he is equipped to accept gasoline at his filling station in tank cars, or that his profits are so small that he must give up supplying his customers with 'Socony' products. The inference is also clear that he buys and sells the products of other integrated or independent companies on the same terms as those of the defendants. There is obviously no discrimination in terms or price between him and other retail customers of the defendants."

■ I : always been necessary to prove that price differentials are likely to cause injury, create monopoly or otherwise offend in the manner condemned by Section 2. Such injury or threat of injury is not inferable from the price structure alone. While inferences are sometimes indulged they are not inferences of facts based upon harmless differentials, equally reconcilable with other inferences, from which the required threat of injury or actual injury to competition is inferred. If facts are established reasonable inferences may be drawn. If the facts established also support other inferences than those supporting the offense, such inferences may be drawn. In

956

case the facts are equally reconcilable with an inference in favor of innocence of wrongdoing and the commission of the offense, the inference of innocence should prevail.

The respondent relies upon the decision of the Supreme Court in the Corn Products case, which affirmed the decision of this Court, supra. There the facts which might occur from the prices charged were agreed to by stipulation. The possibility of injury to competition was reasonably to be inferred from such admitted result of the practice complained of. In that case the Supreme Court said: "It was stipulated, and the Commission found, that the allowances in question were 'sufficient', if and when reflected in whole or in substantial part in resale prices, to attract business to the favored purchasers away from their competitors, 'or to force (their) competitors to resell * * * at a substantially reduced profit, or to refrain from reselling.' But it is asserted that there is no evidence that the allowances ever were reflected in the purchasers' resale prices. This argument loses sight of the statutory command. As we have said, the statute does not require that the discriminations must in fact have harmed competition, but only that there is a reasonable possibility that they 'may' have such an effect. We think that it was permissible for the Commission to infer that these discriminatory allowances were a substantial threat to competition." (Corn Products Refining Co. v. Federal Trade Commission, 324 U.S. 726, 65 S.Ct. 961, 969, 89 L.Ed. 1320, 1334.)

By two hypothetical questions propounded to witnesses, many of whom were not shown to possess any qualifications for the opinion given, the Commission attempted to establish a probable result from the continuance of the price discount system of petitioner from which the possibility of injury to competition might be inferred. These opinions are at variance in so far as injury defined by the Act is concerned with the actual facts admitted by many of the witnesses whose opinions were sought, and as otherwise established. One question was, "If you were selling Morton's Blue Package salt at $1.65 per case while at the same time a competitor seller was selling it for $1.63 per case, would your business be affected?" The similar question was, "If you were paying $1.50 per case for Morton's Blue package salt while a competitor was paying $1.40, would your business be affected?" Fifty-one of the Commission's witnesses were thus interrogated over petitioner's objection. Thirty-two thought their business might be affected. None specified in what manner, to what extent, or what bearing such injury might have upon their competitive position or business profit. Twenty-nine (some of the 32 included) observed that while the competitor enjoying the discount might have an opportunity to make more profit, there would be no effect on competition, if, as the record demonstrates to be the fact, the discount was not used to reduce the sale price of the product. This had not occurred in the past.

Any businessman would readily admit that to some degree the price paid by a competitor for a product sold by him affects his business, but that is far from establishing that such price differential would force either of them to re-sell at a substantially reduced profit or to refrain from re-selling as was stipulated in the Corn Products case, supra. This does not inferentially establish that the competitive position of either of them is being or may be injured, or that competition in the wholesale or retail business in the same line of commerce in general is being or may be injured or that the price differentials in question actually affect or may affect the competitive re-sale fluctuations in the trade.

The record in this case shows that wholesalers and retailers attempt only to stay in general line with competitors' prices; they distinguish between the effect of regular and special sale prices, and between the prices of cash-and-carry houses or stores and those of regular service houses or stores; competition between other salt manufacturers or between salt wholesalers and retailers has not been injured, and monopoly has not been promoted by the quantity price structure for the salt products manufactured, sold and delivered by petitioner, and there is no evidence that such will be the probable effect from a continuance

thereof. In our opinion the Commission has confused "injury to competition" with the normal effect resulting from the differences which normally arise in the buying of smaller or larger quantities of any product, which we held did not constitute wrongful discrimination (Corn Products Refining Co. v. Federal Trade Commission, supra, 144 F.2d 220).

Contrary to the inferences drawn by the respondent Commission upon this foundation, the evidence shows substantial increases in sales to all non-discount customers in all trade areas for the entire period covered by the Commission's evidence. The inference, if any could be drawn, was that the quantity discount system of petitioner tended to increase, not injure, competition. The least that can be said for this evidence is that it completely rebuts the opinion evidence elicited upon the hypothetical questions and renders same a wholly insufficient foundation for the inference of injury, or probability of injury, to competition.

The quantity carload discount of petitioner was related by substantial and uncontroverted evidence to the cost of the sale and delivery of petitioner's product resulting from the different method of handling a carload quantity in the sale and delivery to a carload quantity buyer from the method of handling lesser quantities. It cannot be said from the record that this differential exceeds a due allowance for the difference in such costs.

In respect to the other quantity discounts, it does not appear that the differentials resulting from the discounts are not based upon or related to due cost allowances in the manufacture, sale and delivery of these products. Neither is there testimony to the contrary. As pointed out in the brief of the respondent Commission, a wide gap separates the normal purchaser from even the 5,000 case Blue Label customer and an even wider gap separates the latter from a 50,000 case Blue Label customer, and an equally wide or even wider gap separates the $50,000 standard salt purchaser from the small quantity normal purchaser.

Where price differentials are determined solely by the quantity of the product purchased and the difference in the specified units in each bracket is large and substantial so as to show a relationship between the cost advantages deriving from the large scale business and price differentials, and such price differentials are a relatively small part of the selling price, as in this case, no presumption should arise that such differentials do not correspond with the due cost allowances of the vendor in the manufacture, sale and delivery of his product. This would especially be true where the vendor engaged in the combined activity of manufacturing, selling and distributing, as does petitioner. This is the instant case.

Upon the establishment of the facts shown by this record, was the respondent Commission justified in concluding that these price differentials did not correspond with such due allowances, by reason of the failure of the petitioner to affirmatively prove by direct evidence such due allowances were the bases for its quantity discount system? We think not under facts such as these. Upon different facts, especially if the price and discount structure should in any case be closely bracketed with disproportionate price differentials, this result might not apply. The facts would determine. Moreover, we are not prepared to say that the relationship of quantity price differentials to due cost allowances is an affirmative defense of justification to discrimination contemplated by Section 2(b), for the reason that the defense contemplated by that section is not a defense to *any* price discrimination, however harmless, but to the wrongful price discrimination forbidden by Section 2(a). The defense of justification is the defense to a violation either admitted or established.

In the absence of evidence and finding that a particular price derived from a quantity discount is discriminatory, and carries the probability of injury to competition, etc., and, in the case of quantity price differentials, that same were not related to reasonable cost allowances, there would be no wrongful discrimination, and the defense of justification would not be in order. One does not justify an act which is harmless, inoffensive and legal. One such defense **is**

specifically reserved by Section 2(b), and is that the lower charge, although discriminatory and injurious, was, nevertheless, made in good faith to meet competition.

There was no substantial evidence and no finding that these specific discounts were wrongfully discriminatory. The general and all-inclusive legal conclusion and finding (paragraph 10) "That the effect of the discriminations in price, including discounts, rebates and allowances, generally and specifically described herein may be substantially to lessen competition," is insufficient. The burden of proving the wrongful discrimination as defined by Section 2(a) upon the evidence in this case did not shift by reason thereof under Section 2(b) of the Act.

The so-called competitive price adjustments in special instances and limited areas, are found discriminatory. We find that there is substantial evidence tending to support the findings of the Commission that these so-called adjustments for whatever purpose made are not maintained to meet the lower prices of present competition, or if originally so made, are not now continued for such purpose, and are discriminatory. The respondent Commission does not, however, find that the effect of such discrimination is to substantially lessen competition, or tend to create a monopoly or to injure, destroy or prevent competition with petitioner or with its customers who receive the benefit of these discriminatory prices, and there is little evidence upon this question. Such facts and supporting findings thereon are essential elements under the Act and must be found to exist for the Commission to exercise its jurisdiction in issuing the order in question. These facts were not admitted. The general finding is insufficient for this purpose.

It is contended by the respondent Commission that its findings as to the facts, as supported by testimony, are conclusive. Section 11 of the Clayton Act, 15 U.S.C.A. § 21. However, this provision as interpreted by the Courts does not relieve the Commission of making a substantial showing and proper findings. The Supreme Court has said in respect to a similar statutory provision: "Section 10(e) of the Act

[29 U.S.C.A. § 160(e)] provides: '* * * The findings of the Board as to the facts, if supported by evidence, shall be conclusive'. But as has often been pointed out, this, as in the case of other findings by administrative bodies, means evidence which is substantial, that is, affording a substantial basis of fact from which the fact in issue can be reasonably inferred. * * * Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. 'It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' * * * and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." (National Labor Relations Board v. Columbian Enameling & Stamping Co., 306 U.S. 292, 299, 59 S.Ct. 501, 505, 83 L.Ed. 660, 665).

To like effect see Consolidated Edison Co. v. National Labor Relations Board, 305 U. S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126, 140; B. S. Pearsall Butter Co. v. Federal Trade Commission, 7 Cir., 292 F. 720, 723; Carlay Co. v. Federal Trade Commission, 7 Cir., 153 F.2d 493, 496. The evidence must disclose something considerably more than a mere possibility of injury. Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 356, 42 S.Ct. 360, 362, 66 L.Ed. 653, 658; International Shoe Co. v. Federal Trade Commission, 280 U.S. 291, 298, 50 S.Ct. 89, 91, 74 L.Ed. 431, 441; Standard Oil Co. v. Federal Trade Commission, 3 Cir., 282 F. 81, 86, affirmed 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746. If competition still flourishes or increases after the acts complained of have been committed, then the evidence of possibility of injury must be convincing. Pennsylvania R. Co. v. Interstate Commerce Commission, 3 Cir., 66 F.2d 37, 38, 39, affirmed 291 U.S. 651, 54 S.Ct. 559, 78 L.Ed. 1045; Pick Mfg. Co. v. General Motors Corp., 7 Cir., 80 F.2d 641, 644, affirmed 299 U.S. 3, 57 S.Ct. 1, 81 L.Ed. 4; Standard Oil of New York v. Federal Trade Commission, 2 Cir., 273 F. 478, 482, 17 A.L.R. 389.

Petitioner complains of the general sweeping language of the order to cease

and desist and urges that the same exceeds the jurisdiction of the Commission. The gist of this order is to require the petitioner to conduct its business generally at its peril, leaving the Commission or any person or litigant claiming injury to harass petitioner by proceedings under the Act for a mistake in interpretation or application of the order. In a similar case in disposing of a sweeping and general order of the National Labor Relations Board, the Supreme Court said: "But the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged. * * *

"We hold only that the National Labor Relations Act does not give the Board an authority, which courts cannot rightly exercise, to enjoin violations of all the provisions of the statute merely because the violation of one has been found." National Labor Relations Board v. Express Pub. Co., 312 U.S. 426, 435, 61 S.Ct. 693, 699, 85 L. Ed. 930, 936.

This Court took a similar view in respect to an order of the Federal Trade Commission in Milk and Ice Cream Can Institute v. Federal Trade Commission, 7 Cir., 152 F.2d 478, 483, in which we sustained specific provisions but held the sweeping, general and catch-all provisions to be beyond the jurisdiction of the Commission. This Court said: "We are of the view, however, that one provision contained in paragraph (7) of the order should be eliminated. By it petitioners are enjoined from 'formulating or putting into operation any other practice or plan which has the purpose or effect of fixing or maintaining prices for metal milk or ice cream cans.' The present plan has been tested and found unlawful and we see no reason why some other plan of which the Commission might complain should not be tested in the usual way rather than in a proceeding for violating the cease and desist order, as would be the case if this provision should remain in the order."

This objection to the order of the Commission is equally applicable in our case and should be sustained.

The prayer of the petitioner should be allowed and the findings and order of the respondent Commission are set aside and its complaint against the petitioner dismissed.

MINTON, Circuit Judge (dissenting).

If I, a small buyer of salt, have to pay more for my salt than a larger buyer does because he is a large buyer, it seems clear to me that I have been discriminated against as to price. It must have seemed that way to Congress, because under the Clayton Act quantity discounts were expressly excluded from discrimination. The Robinson-Patman amendment to the Clayton Act eliminated the exclusion of quantity discounts, unless related to the cost of production, sale, and delivery. See Goodyear Tire & Rubber Co. v. Federal Trade Commission, 6 Cir., 101 F.2d 620-624. I therefore think that quantity discounts are discriminatory per se and can be justified only when properly related to the cost of production, sale, and delivery.

Discrimination must be such that its effect "may be" substantially to lessen competition. It does not have to be shown, and therefore found by the Commission, that such discrimination actually lessened competition, etc. It is sufficient if it is found that there is a reasonable possibility that the discriminatory acts "may" have such an effect. Corn Products Refining Co. et al. v. Federal Trade Commission, 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320. This called for the expert judgment of the Commission, and the Commission in its findings found that the effect of the discriminatory acts of the petitioner "may be substantially to lessen competition in the line of commerce in which the purchaser receiving the benefit of said discriminatory price is engaged and to injure, destroy, and prevent competition between those purchasers receiving the benefit of said discriminatory prices, discounts, rebates, and allowances and those to whom they are denied."

This ultimate finding of fact is based upon subsidiary findings which in turn have

960

substantial evidence in the record to support them.

The quantity discounts, in my opinion, are discriminatory and may have the effect denounced by the statute. The fact of the discrimination itself, it seems to me, would have supported an inference that the effect may be to lessen competition. The Supreme Court held such an inference would have been justified in the case of Corn Products Refining Co. et al. v. Federal Trade Commission, supra. Mr. Chief Justice Stone said in that case, 324 U.S. at page 742, 65 S.Ct. at page 969, 89 L.Ed. 1320: "We think that it was permissible for the Commission to infer that these discriminatory allowances were a substantial threat to competition."

The same thing seems true to me in the instant case, but there was abundant evidence in the record to support the finding, in addition to proper inferences. I think the order should be enforced.